Filed 11/26/25  P. v. Holden CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B335544 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA057505) |
| v. | |
| GARY LAMAR HOLDEN, et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Amy N. Carter, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant, Gary Lamar Holden.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant, Charles Walker.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, and Lauren N. Guber, Deputy Attorneys General, for Plaintiff and Respondent.

## I.   INTRODUCTION

Defendants Gary Holden and Charles Walker appeal from the trial court's denial of their petitions for resentencing under Penal Code section 1172.6.[1]  According to defendants, the court's factual findings after an evidentiary hearing were not supported by substantial evidence and the court was precluded from making certain findings under the doctrine of collateral estoppel.  We affirm.

## II.   FACTUAL BACKGROUND

A.   *Trial Evidence*[2]

1.   The Shooting

a.   Lazaro Isidoro

On January 30, 2004, Lazaro Isidoro went to a taco stand on the corner of Century Boulevard and Normandie Avenue in Los Angeles County.  A male, later identified by Isidoro as the shooter, approached and asked Isidoro if he was from "South Los," a local Mexican gang.  Isidoro responded, "'I don't bang.'"  The shooter was with two other men, and Isidoro had seen the

---

[1]   All further statutory references are to the Penal Code.

[2]   At the evidentiary hearing on defendants' section 1172.6 petitions, the prosecution introduced the reporter's transcripts of defendants' 2004 jury trial.

2

three earlier at a gas station across the street from the taco stand with a group of 10 to 15 men.

As Isidoro waited for his food, he heard the shooter tell one of his two companions, later identified by Isidoro as the puncher, "'Look, that's the bitch that owes us.'" The shooter was referring to the victim Dante Tatum who was standing nearby at the bus stop next to the taco stand.

The puncher approached Tatum and hit him at least twice. The puncher then stepped back, and the shooter moved forward and, using his left hand,[3] fired at Tatum with a semi-automatic handgun three or four times. After the shooting, the shooter and his two companions ran north on Normandie to 99th Street where they turned east.

### b. Charlie Watson

On January 30, 2004, Charlie Watson was at an apartment on 99th Street with defendants, his two cousins, and some other males. The apartment was in 99th Street Mafia Crips (99th Street) territory. Watson was an associate of that gang and Holden was a member. Earlier that day, Watson had seen Holden with a small black gun, and he also saw Walker with a gun which Walker described as either a .22 or .25 caliber.

Holden left the apartment by himself that evening, and later Watson, Walker, and the two cousins left together to look for him. They went to a gas station on the corner of Century and Normandie near 99th Street territory. While there, Watson saw

---

[3] At trial, the parties stipulated that Holden had a birth defect to his right hand that limited its use and that he was left-handed.

Holden across Century at a taco stand near the bus stop where Tatum was standing. Holden then crossed Century to the gas station where Walker, Watson, and the two cousins were gathered. Watson asked Holden if he was "'all right,'" and Holden replied that he wanted Watson to go back across the street to the bus stop with him. Watson heard Holden say, "'That's my enemy across the street.'"

Watson walked with Holden and Walker back across the street to Tatum's location while the two cousins stayed behind at the gas station. At the bus stop, Watson saw Walker approach Tatum, throw a punch, and begin fighting with him for a few seconds. Holden then pulled from his pocket the small black gun Watson had seen earlier in the day and began shooting at Tatum. After Watson heard two or three shots, he ran back to the gas station where his two cousins were waiting, and Holden followed. But Watson lost track of Walker.

     2.     <u>The Investigation</u>

     a.     Autopsy

Tatum died from a gunshot wound to the neck and also suffered a nonfatal gunshot wound to his right buttock and contusions to his right cheek and temple. He was shot from a distance of at least three feet away. One of Tatum's tattoos, noted during the autopsy, read, "'I'm a Deuce.'"

### b. Investigating Officers and Criminalists

Los Angeles County Sheriff's Department Deputy Daniel Leon was called to the scene about 10:20 p.m. that evening to assist in setting up a perimeter. About an hour after he and other deputies had established the perimeter, they focused on an apartment building at 1323 99th Street. The occupants of one of the units were ordered out, and the deputy arrested Holden.

At approximately 10:00 a.m. the next morning, Deputy Leon observed Walker leaving a residence on 97th Street and arrested him. During their search of that location, detectives recovered a .25 caliber handgun from a car in the backyard of the residence. The bullet recovered from Tatum's body and the shell casings recovered from the shooting scene had been fired from the gun.

On January 31, 2004, after Walker was booked, Deputy John Davoren conducted a gunshot residue test on him. During the test, defendant asked the deputy if the test "was regarding the shooting from last night . . . [a]nd if . . . the other guys that had been arrested had also had this test done to them." He then told the deputy that "he was with those guys the previous night." Walker's gunshot residue test was negative.

### c. Gang Expert

Detective William Pickett, the prosecution's gang expert, was familiar with the 99th Street criminal street gang. Its primary criminal activities were drug sales, vehicle thefts, and violent crimes, including assault with deadly weapons, robbery, and murder. The apartment where Watson and defendants

5

congregated before the shooting was a 99th Street gang hangout, a location to which the detective had been numerous times. The Ten Deuce Budlong Gangster Crips (Ten Deuce) gang and 99th Street were enemies.

The gas station on the corner of the intersection at Century and Normandie was in 99th Street territory and the taco stand across Century from the gas station was in Ten Deuce territory. If a 99th Street gang member went into Ten Deuce territory and encountered one of its members, the detective would expect a violent conflict. Based on his experience working with gangs, the detective explained that, if he saw a known gang member in a rival gang's territory, he would assume that member went there to "either . . . be killed or . . . to kill somebody."

In response to a hypothetical based on facts similar to those surrounding the shooting, Detective Pickett opined that the shooting was gang related and was committed with the specific intent to further the reputation or interests of the 99th Street gang.

B.    *Hearing Evidence*[4]

1.    Holden Interview

During his interview, Holden provided "multiple versions of events . . . ."  In the first version, Holden said he was "passed out drunk" at the 99th Street apartment during the entire time frame of the crime.

In the next version, Holden admitted he was in the vicinity of the shooting, but denied witnessing it.  According to Holden, he was drinking outside the 99th Street apartment with others.  He was aware "Blue" had a gun, and identified Walker as Blue.  Walker left the group, but came running back, and then everyone started running because Walker said he shot someone.

When detectives told Holden they had "'dog scent'" evidence that contradicted his version of events, he claimed that he was at the door when Walker and others came inside the apartment building to hide.  In yet another version, Holden claimed he did not see what happened.

---

[4]    At the evidentiary hearing, the prosecution introduced recordings of statements made by Holden and Walker during police interviews after the shooting which were not introduced during the jury trial.  The parties stipulated that a defendant's interview statements would not be admissible against the other defendant.  Defendants did not include the recordings or copies of the transcripts in the record, and the Attorney General did not request judicial notice of them.  Instead, the parties cite to the trial court's summation of the recordings in its written rulings.  We treat the parties' reliance on the trial court's summary of the recordings of each interview as a stipulation to the accuracy of the summary.

In the final version, Holden admitted to going near the location of the shooting with the others. According to Holden: "'We went down Normandie to Century, turned back around "cause we seen the guy at the bus stop,'" and [Walker] 'socked him.' Holden said he was 'right on the side of [Walker].'" Holden again identified Walker as "'the dude with the gun,'" stated he saw Walker with the gun prior to the attack that night, and also explained Walker showed him the gun as recently as the prior week and admitted he held it.

### 2. Walker's Interview

During his interview, Walker admitted he was a Santana Block Crips gang member, but claimed he had not hung out with the gang for the last two years. Walker first told detectives he was at the 99th Street apartment with some friends drinking and talking to some girls. He said he heard some shots, but had no knowledge of the murder or murder weapon.

When police asked about the gun, Walker denied having a gun that night, but said he saw someone in the group of people at the apartment with a gun, initially claiming not to know him. He "believed h[e] saw a black .25 caliber handgun 'in the dude's hand who was shooting it.'" But he then said that "'Slow'" had the gun, meaning Holden.

Walker next claimed that "Slow and the two others were 'walking over to tell us to come here, so we was running down there to see what's going on. Boom they say dude was the

8

enemies, so then we ran over there you know.'"[5]  Walker said the entire group then ran to the gas station.

Walker admitted he saw the fight with Tatum.  He first denied seeing who was shooting, but then identified Holden as the shooter.  He believed Holden shot with his right hand, but he was not sure.

Walker initially said that Holden was running with a gun in his hand and that he did not know what Holden did with the gun.  Detectives then implied that, if Walker had handled the gun after it was fired, gunshot residue would be on Walker's hand and asked whether the gun had been handed off to him after the shooting.  At that point, Walker admitted that the gun had been handed off to him and he had "'thrown it away.'"  Walker later admitted putting the gun in the car in the backyard of the house where he lived.

### III.    PROCEDURAL BACKGROUND

On November 9, 2004, a jury found Holden and Walker guilty of second degree murder.  As to Holden, the jury found not true the allegations that he personally used a firearm; personally used and discharged a firearm; and personally used and discharged a firearm causing great bodily injury or death.  But as to Walker, the jury found true the allegations that a principal personally used a firearm; a principal personally used and discharged a firearm; and a principal personally used and discharged a firearm causing death.  And, as to both defendants,

---

[5]      Walker was asked by a detective, "'When you say enemy over there you mean over on the bus bench next to the taco stand?'"  Walker answered in the affirmative.

9

the jury found true the allegation that the crime was committed for the benefit of a criminal street gang.

The trial court sentenced Holden to 15 years to life for the murder, plus 10 years for the gang enhancement; and it sentenced Walker to 15 years to life for murder, plus 10 years for the gang enhancement, and 15 years for the firearm enhancement.

Defendants each filed petitions for resentencing on their murder convictions under former section 1170.95 (now section 1172.6) which were denied at the prima facie stage, but that decision was reversed on appeal and remanded for an evidentiary hearing. (*People v. Walker et al.* (Feb. 25, 2021, B305337 [nonpub. opn.].)

Prior to the hearing, in a motion to admit evidence, the prosecution requested leave to introduce evidence showing Holden was the shooter, arguing the jury's findings to the contrary were not entitled to preclusive effect. At the December 11, 2023, hearing on the motion, the trial court clarified its understanding that "there was an agreement among the parties that whatever my findings will be, I am not permitted to find, beyond a reasonable doubt, that defendant Holden is the shooter." Both defendants thereafter emphasized that finding Holden to be the shooter would constitute reversible error, and the prosecutor stated that he agreed with the defense argument that the court "cannot say legally" that Holden was the shooter.

Following an evidentiary hearing, the trial court took the matter under submission and later issued written rulings denying each petition. In each ruling, the court explained, "This court will adhere to the jury's finding that there was not proof beyond a reasonable doubt that Holden was the shooter . . . .'"

As to Holden, the trial court found that "Holden knew of the plan to shoot the victim, and . . . specifically intended to, and did in fact, aid, facilitate, promote, encourage, and instigate the commission of the murder. The People having proved beyond a reasonable doubt that . . . Holden is guilty of murder as a direct aider and abettor under current law, his petition filed under . . . [s]ection 1172.6 . . . is [denied]."

The trial court explained: "Holden's role as ringleader and figurative and literal 'shot caller' is evident from the fact that he is the one who searched for and identified [Tatum] in rival gang territory, and then had enough influence to recruit associates to accompany him on the dangerous trip back into rival gang territory to carry out the crime. Holden apparently initially viewed witness Isidoro as a potential victim when he questioned Isidoro regarding his gang membership. Then Holden ultimately selected [Tatum]. . . crossed back over into his own gang territory, and pointed [Tatum] out to his associates. [¶] . . . [¶]

"The murder weapon was openly discussed and passed around between Holden and Walker. Although the jury had a reasonable doubt as to whether Holden was the shooter, there is no doubt that the gun was brought into Ten Deuce rival gang territory by Holden and his two backup soldiers, because it was used to kill [Tatum]. The evidence establishes that the murder weapon was treated as a shared resource between the defendants . . . . The evidence establishes that the smaller contingent of three people who walked back across the street to where [Tatum] was located were comfortable leaving the safety of their greater numbers at the gas station because they knew they brought the shared resource of the gun with them. In his recorded statement, Holden himself admits to knowing that Walker had a gun, seeing

11

the gun, and even handling the gun before the murder. . . . [E]ven if Holden was not the shooter, the evidence establishes beyond a reasonable doubt that Holden recruited Walker to bring the gun and shoot the 'enemy,' then stood directly next to Walker while Walker did exactly what Holden had brought him there to do. The evidence establishes that Holden knew that the shooter intended to shoot at [Tatum], and Holden intended to assist the shooter in the life-endangering act of shooting [Tatum] . . . , which proximately caused [Tatum's] death."

In denying Walker's petition, the trial court explained: "There is evidence to support an inference that Walker himself was the shooter. Independent witness Isidoro testified that . . . Tatum was struck on his right cheek, meaning that Walker would have punched Tatum with his left hand, in order to strike Tatum on his right cheek. The reasonable inference that an assault would be initiated with the attacker's dominant hand tends to show that Walker is left-handed. This is consistent with all accounts that the shooter was left-handed. On this basis, one reasonable conclusion is that Walker fired the fatal shot at Tatum. . . .

"[But i]f Walker was not himself the actual shooter, the only other reasonable conclusion from the evidence is that Walker intended to aid in the shooting of Tatum. Walker's movements were choreographed to aid and abet in the murder: he punched the victim, then moved back out of the way to facilitate the shooting, demonstrating his knowledge and expectation that shots would be fired, and he needed to create a clear shot by moving out of the way. [¶] When Holden identified their target, Walker initiated the physical confrontation with Tatum. Walker struck Tatum at least twice, and stepped back.

This allowed the shooter a clear path to fire seven times at Tatum.

"Taken together with the other evidence, the only reasonable conclusion is that Walker's actions were intended to aid Tatum's shooting. The group all knew of and handled the murder weapon earlier that day. The group crossed into rival gang territory with the weapon to confront Holden's enemy. Walker initiated the physical confrontation with the targeted 'enemy.' After the shooting, Walker hid the weapon for the group. While he was being tested for gunshot residue, Walker admitted to being with the group that killed Tatum. Walker changed his story multiple times when interviewed. . . . [T]he only reasonable conclusion is that Walker knew of the shooter's intention to shoot Tatum at the time he struck Tatum. Walker then backed away to allow a clear firing path, with the intention of aiding the act of shooting. Thus, . . . Walker is not entitled to relief."

## IV.   DISCUSSION

A.   *Substantial Evidence of Implied Malice*

Defendants challenge the sufficiency of the evidence in support of the trial court's finding at the evidentiary hearing that they acted with the implied malice necessary to be guilty of directly aiding and abetting second degree murder.

According to Holden, "[t]here was no evidence . . . Holden had any knowledge that another individual was armed at the time of the assault and intended to shoot the victim when . . .

13

Holden at most aided and abetted . . . Walker's punching Tatum in a fist fight."

According to Walker, (1) the trial court's finding that Walker was aware Holden was armed and intended to shoot Tatum was precluded by the jury's findings on the personal use allegation as to Holden; (2) there was insufficient circumstantial evidence that Walker's punching of Tatum "was [a] preplanned diversionary tactic to afford the shooter[ ] a better opportunity to shoot and kill Tatum"; (3) and the court's finding that Walker's fight with Tatum was diversionary was "logically unreasonable."

### 1.    Legal Principles

At a section 1172.6 evidentiary hearing, "the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill [No.] 1437 (§ 1172.6, subdivision (d)(3)).  In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.'  (*Ibid.*) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'  (*Ibid.*)"  (*People v. Wilson* (2023) 14 Cal.5th 839, 869.)

Here, the trial court found there was substantial evidence the defendants were guilty of directly aiding and abetting implied malice murder, a theory of murder still available under the law as amended by Senate Bill No. 1437.

14

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice,[6] the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." [Citations.]" (*Reyes, supra*, 14 Cal.5th at pp. 990–991.)

"Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) "'It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be

---

6      "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) "To suffice for implied malice murder, the defendant's act must . . . "'involve[] a high degree of probability that it will result in death.'"" (*Id*. at p. 989.)

15

proven by circumstantial evidence.'" (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 512.)

2. Standard of Review

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."" [Citation.] But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes, supra*, 14 Cal.5th at p. 988.)

3. Analysis

a. Holden

We conclude the evidence is sufficient to support the trial court's finding that Holden acted with implied malice. Contrary to Holden's contention, there was substantial evidence that Holden knew that one of the other two men who approached Tatum was armed with a gun. Indeed, Watson saw Holden with a gun earlier on the day of the murder and Holden admitted to the police that he saw Walker with the gun a week prior and was aware Walker had a gun with him at the hangout before the shooting.

16

Substantial evidence also supports a finding that Holden knew of and shared the intent of the shooter. The evidence submitted at the hearing showed Holden was a 99th Street member; that gang's enemy was the Ten Deuce gang; the shooting occurred in Ten Deuce territory; Tatum had a tattoo that stated, "I'm a Deuce"; and Holden willingly accompanied his two fellow gang members into Ten Deuce Territory knowing one of them was armed. According to the gang expert, because of the intense rivalry between those two gangs, if a 99th Street member, or a group of them, went into known Ten Deuce territory, it would be an act of defiance and the trespassing member, or members, would either "be killed" or "kill somebody." (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [prosecution "'entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent"'"].)

And, substantial evidence supports a finding that Holden, by words and conduct, aided in the shooting. Holden left the 99th Street apartment first and when he next met with his compatriots, he identified Tatum, a rival gang member, as the "enemy." The trial court could reasonably infer that during the period that he was alone, Holden had sought out and successfully identified Tatum. Further, Holden then recruited two others to accompany him back to the taco stand in enemy territory and pointed out the victim to them. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 [defendant's presence, during an ongoing gang war, as a passenger in a car which then pulled out of a parking lot to pursue victim's car, and his staring at occupants of victim's car, supported a finding that defendant "knew of [the shooter's]

17

intent to kill, shared that intent, and aided [the shooter] by spotting potential targets"].)

> b.     Walker

As to Walker's intent, the gang evidence and gun evidence discussed above in relation to Holden also applied to Walker and supports a finding that Walker acted with implied malice. Walker had seen Holden with a gun on the night of the shooting and therefore the trial court could reasonably infer that he knew, when the three men walked into enemy territory, at least one was armed with a gun. Moreover, although he was not a member of 99th Street, there was evidence that Walker was a member of another local gang in Compton who had been associating with 99th Street member Holden during the week before the shooting, gathered together with him and Watson at the 99th Street hangout on the night of the shooting, and then followed Holden to the gas station before deciding to cross over into enemy territory with Holden and Watson. That evidence, combined with the expert's opinion characterizing such trespassing into gang territory as a willful act of defiance with potentially deadly consequences, supports an inference that Walker was aware of and shared the shooter's motive and intent.

Walker's conduct also supports a finding that he aided in the shooting. Walker accompanied Holden and Watson to confront a lone rival gang member in enemy territory. Watson saw Walker punch Tatum immediately after Holden pointed him out at the bus stop. Isidoro also saw one of the two men with the shooter punch Tatum at least twice before stepping back, leaving

18

a clear path for the shooter to approach and fire seven shots at Tatum at close range.

Walker argues that the trial court's finding that he was aware Holden had a firearm on the night of the shooting and intended to use it to shoot Tatum was precluded by the jury's not true finding on the personal use allegations against Holden. But, consistent with the parties' agreement, the court did not find that Holden was the shooter. Instead, it based its finding concerning Walker's awareness of Holden's plan on the evidence that both Holden and Walker had been seen earlier in the day with the gun and Walker's admission that he had seen Holden with it a week before and on the night of the shooting, and had taken the gun from Holden after the shooting and disposed of it. Because the gun was carried to the scene and used by one of the trio and then carried away by Walker, the court could have reasonably inferred from such evidence, not that Holden necessarily used the weapon to shoot Tatum, but that Walker was aware of Holden's prior possession of the gun and therefore his intent to return to the taco stand with others in a coordinated effort to shoot Tatum.

Walker also contends that the circumstantial evidence, at best, supported only an inference that the trio planned to return to the taco stand for "a simple gang beatdown," not a "preplanned diversionary tactic to afford the shooter . . . a better opportunity to shoot and kill Tatum." That contention, however, is based on contrary inferences drawn from the evidence, including Walker's view of the limited inferences to be drawn from the gang expert's opinion that a gang member who intentionally crossed into enemy gang territory went there to either kill or be killed. As we explain above, substantial evidence supports the trial court's contrary conclusion. (*People v. Rodriguez* (2021) 66 Cal.App.5th

749, 773 ["'If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding'"].)

In a similar argument, Walker maintains that the trial court's conclusion—that the physical assault on Tatum was a diversionary tactic—is illogical. But that assertion is again based on contrary inferences drawn from the circumstances of the shooting, including Watson's testimony that, once Tatum was pointed out to the group, one the three immediately moved in to punch him twice and then disengaged and backed away, immediately after which the shooter moved in and fired seven rounds at him at close range. Although that evidence may support a contrary inference that the attack was not a preplanned diversion, but instead part of a rapidly unfolding sequence of unrelated events, the court's findings are supported by substantial evidence and we defer to those findings.

B. *Issue Preclusion*

Defendants argue that the trial court's finding that they planned the assault and murder of Tatum was precluded under the doctrine of collateral estoppel. According to defendants, the court's finding was based on a factual theory that the jury rejected when it found defendants guilty of second degree murder, rather than first degree premeditated murder on which they had also been instructed.

20

1.      Legal Principles

"In general, whether a prior finding will be given conclusive effect in a later proceeding is governed by the doctrine of issue preclusion, also known as collateral estoppel.  [Citations.]  This common law doctrine is 'grounded on the premise that "once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.'"  [Citation.]  The doctrine '"has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.'"  [Citation.]  It applies in criminal as well as civil proceedings.  [Citations.]

"As traditionally understood and applied, issue preclusion bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled.  First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.'  [Citation.]  And while these threshold requirements are necessary, they are not always sufficient:  'Even if the[] threshold requirements are satisfied, the doctrine will not be applied if such application would not serve its underlying fundamental principles' of promoting efficiency while ensuring fairness to the parties.  [Citations.]  It is the burden of the party seeking to prevent relitigation based on prior findings to raise the defense and

21

establish its elements. [Citation.]" (*People v. Strong* (2022) 13 Cal.5th 698, 715–716.)

The jury was instructed in the prior trial to determine whether defendants acted with the premeditation and deliberation required for first degree murder. "If the murder is 'willful, deliberate, and premeditated,' it is first degree murder. [Citations.] ""In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.""" [Citation.] "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citation.]'" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

2.      Analysis

The Attorney General contends that defendants' collateral estoppel contention is forfeited because they failed to timely raise the issue with the trial court. We agree.

As explained, prior to the section 1172.6 hearing, the prosecution moved to introduce evidence that Holden was the shooter, despite the jury's prior finding that he did not personally use or discharge the gun during the commission of the murder. The parties then agreed that a finding that Holden was the shooter would be contrary to the jury's finding, and the trial court

22

accepted and followed that limitation in considering the evidence at the hearing.

Despite a similar opportunity to discuss the premeditation issue with the trial court prior to the hearing, defendants did not raise it with the court at that time or later during the presentation of evidence and arguments on the merits. And, when the court issued its final written ruling, defendants did not object to the court's express finding that defendants planned to shoot Tatum. Under these circumstances, we conclude the collateral estoppel issue has been forfeited. (See *People v. Curiel* (2023) 15 Cal.5th 433, 452 [the party seeking to prevent relitigation based on prior findings has the affirmative duty to raise the defense and establish its elements]; *People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [it is well established that a right of any sort may be forfeited in criminal as well as civil cases by the failure to make a timely assertion of the right before a tribunal having jurisdiction to determine it]; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 [claims of collateral estoppel forfeited if not timely raised in the trial court during section 1172.6 proceedings].)

But even if we were to reach the merits of defendants' collateral estoppel argument, we would reject it. The jury in the prior trial was called upon to determine whether defendants acted with the premeditation and deliberation necessary for first degree murder, that is, only after careful thought and weighing of considerations. The jury's finding rejecting the premeditation theory did not preclude the trial court, during the section 1172.6 evidentiary hearing, from finding that defendants planned to shoot Tatum, but did not act with reflection or after weighing the consequences inherent in that plan and instead acted rashly and

23

impulsively. Thus, the doctrine of collateral estoppel did not prevent the court from finding that defendants acted with implied malice but did not act with "'substantially more reflection than may be involved in the mere formation of a specific intent to kill.'" (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264.)

## V.    DISPOSITION

The orders denying the section 1172.6 petitions for resentencing are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

I concur:

KUMAR, J.[*]

---

[*]    Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The People v. Gary Holden et al.
B335544


BAKER, Acting P. J., Concurring



I agree defendants and appellants Gary Holden and Charles Walker are not entitled to relief under Penal Code section 1172.6. But I reach that conclusion free of the constraint the trial court needlessly adopted—one that requires proceeding as if the identity of the actual shooter is unknowable and that compels drawing conclusions built on weak evidentiary inferences. I will elaborate, but I would affirm because strong evidence at the section 1172.6 evidentiary hearing proves defendant Holden perpetrated the express malice murder of victim Dante Tatum and defendant Walker directly aided and abetted the crime.

Evidence at the section 1172.6 hearing established defendant Holden was a member of the 99th Street criminal street gang and victim Tatum had a tattoo indicative of membership in the rival Ten Deuce criminal street gang. There was evidence defendant Holden identified someone in the area where Tatum was loitering as his (defendant Holden's) "enemy" or the person that "owes us." There was eyewitness testimony that defendant Walker accompanied defendant Holden to where Tatum was standing, punched Tatum, and then stepped back—at which point defendant Holden fired multiple gunshots at Tatum from close range. There was evidence defendants fled the scene of the shooting together and the murder weapon was later

recovered at a residence where defendant Walker was found. And there was evidence—not admitted during defendants' earlier criminal trial—of defendants' post-arrest statements. Defendant Holden admitted being present in the vicinity of the shooting when it occurred but offered several inconsistent alibis and eventually suggested defendant Walker was the shooter. Defendant Walker identified defendant Holden as the shooter with less prevarication.

With that evidentiary record, the analysis here should not be complicated: defendant Holden is ineligible for section 1172.6 relief because he killed Tatum with express malice and defendant Walker is ineligible for relief because he directly aided and abetted the crime. (See, e.g., § 1172.6, subd. (a)(3); People v. Coley (2022) 77 Cal.App.5th 539, 547-548.) What has complicated matters, however, is the trial court's decision, largely echoed by today's opinion for the court, to proceed as if defendant Holden was not the one who shot Tatum and to undertake an analysis only of whether defendants were guilty of an implied (not express) malice murder.

Nothing compels this analytical approach and I believe it is legally misguided. There are two reasons why. First, as the trial court itself recognized, the People presented new (in the sense of not having been presented at trial) evidence at the section 1172.6 evidentiary hearing: defendants' recorded post-arrest statements. Section 1172.6 expressly permits introduction of such new evidence, and that leaves me convinced the Legislature did not intend for the trial jury's firearm enhancement not true finding (which in any event could have been merely the product of lenity) to have preclusive effect—at least where, as here, the new evidence (the defendants' own statements that could be the

2

subject of credibility and consciousness of guilt determinations) was obviously relevant to a determination of the identity of the shooter.  (People v. Strong (2022) 13 Cal.5th 698, 716 ["The Attorney General's argument that prior special circumstance findings always foreclose relief in section 1172.6 proceedings is, in effect, an argument that such findings are always preclusive. Although nothing in the statute says so expressly, we agree that such findings can have preclusive effect.  After all, ordinarily 'courts may take it as given that [a legislature] has legislated with an expectation that the principle [of issue preclusion] will apply . . . .'"], second italics added.)  Second, there is no reason to limit the scope of analysis to an implied malice murder.  Even if the jury's rejection of a first degree murder finding were given preclusive effect, that would establish only that the murder was not premeditated.  It in no way forecloses a conclusion that the murder was committed with intent to kill (express malice) because express malice is a viable theory of second degree murder.  (See, e.g., In re Ferrell (2023) 14 Cal.5th 593, 600.)

Because the trial court's approach was legally flawed and the product of an unnecessary analytical election, we could remand the cause to the trial court with directions to redetermine the matter without the mistaken self-imposed constraints.  But I believe this would be pointless.  There is strong evidence defendant Holden committed an express malice murder and defendant Walker aided and abetted the murder with the same

3

mental state.  I would therefore affirm the trial court's order.
(See, e.g., People v. Turner (2020) 10 Cal.5th 786, 807 ["Our task
is to review the trial court's ruling, not its reasoning"].)


BAKER, Acting P. J.